**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Entertainment USA Inc. dba Christie's Cabaret,<br><br>    Plaintiff,<br><br>v.<br><br>Tadeusz Baldinsky,<br><br>    Defendant. | No. CV-22-00970-PHX-DWL<br><br>**ORDER** |

Pending before the Court is Plaintiff's motion to convert this *in personam* action into an *in rem* action pursuant to 15 U.S.C. § 1125(d)(2). (Doc. 13.) For the following reasons, the motion is granted.

## BACKGROUND

On June 6, 2022, Plaintiff filed the complaint (Doc. 1), which alleges as follows. Plaintiff owns and operates several so-called "gentlemen's clubs" under the "Christie's Cabaret" brand. (*Id.* ¶ 10.) Plaintiff has owned a service mark for "Christie's Cabaret" ("the Christie's mark") since 2003 and has owned clubs under that name in Tucson and elsewhere in Arizona since 2006. (*Id.* ¶¶ 11-12.) Plaintiff uses the Christie's mark "continuously and extensively . . . including through its domain name, www.chrstiescaberet.com." (*Id.* ¶ 15.)[1] Plaintiff's President/CEO, Steve Cooper,

---

[1] "A domain name is a unique string of characters or numbers that typically is used to designate and permit access to an Internet website." *Mattel, Inc. v. Barbie-Club.com*, 310 F.3d 293, 295 (2d Cir. 2002). The alleged domain name here, which appears to contain various misspellings, has been reproduced verbatim from Plaintiff's complaint (Doc. 1

discovered—by means of discovery in an unrelated lawsuit—the existence of a website with the domain name www.christiescabarettucson.com, which "contains articles discussing sex-related topics," advertises "chatrooms of online performers," and contains links to websites where users can pay for access to chat rooms with online strippers. (*Id.* ¶¶ 23-25.) "Plaintiff has never offered these services nor associated itself with websites that offer these services" and has never granted the owner of the www.christiescabarettucson.com website permission to use the Christie's mark in connection with the sale or advertisement of such services. (*Id.* ¶¶ 26-27.) The sole defendant named in the complaint is Tadeusz Baldinsky, the registrant of the www.christiescabarettucson.com domain name since February 25, 2019. (*Id.* ¶ 5.)

On October 14, 2022, Plaintiff filed the pending motion to convert this action into an in rem action pursuant to 15 U.S.C. § 1125(d)(2). (Doc. 13.) The motion explains that although the www.christiescabarettucson.com domain name is registered to "Tadeusz Baldinsky," with a postal address listing of 12214 N. Florence Dr. Willow, AR 99688, an email address listing of adult.masta@gmail.com, and a phone number listing of 907-495-6257 (Doc. 13-1 at 21), Plaintiff has not been able to locate any such person. (Doc. 13 at 3-5.) The provided postal address "does not exist in Arkansas but is listed in Alaska." (*Id.* at 4; *see also* Doc. 13-3.) Plaintiff attempted to serve Baldinsky at the Alaska address in July 2022, but the resident at that address informed the process server that Baldinsky did not live there and that she had purchased the property three years ago. (Doc. 13-4.) Plaintiff attempted to call Baldinsky at the provided phone number in August 2022, but the number is not in service. (Doc. 13-6.) Plaintiff also hired a private investigator, who avows in a declaration that no resident named Tadeusz Baldinsky has been affiliated with the Alaska address (but that the address "did possess extensive criminal backgrounds") and that a name search for Tadeusz Baldinsky revealed "no such person currently in existence." (Doc. 13-7 ¶¶ 15-19.) The private investigator concluded that Tadeusz Baldinsky should

¶ 15) and proposed *in rem* complaint (Doc. 13-1 ¶ 25).

be "presumed a fictitious individual." (*Id.* ¶ 20.)[2]

Having determined that Baldinsky may not exist and at any rate cannot be found, Plaintiff sent a notice of claim to the adult.masta@gmail.com email address in preparation for filing the pending motion. (Doc. 13-8.)

**DISCUSSION**

"In order to combat . . . bad-faith registration or use of domain names, Congress enacted the ACPA [Anticybersquatting Consumer Protection Act] as a supplement to the federal trademark statute." *Mattel, Inc. v. Barbie-Club.com*, 310 F.3d 293, 295 (2d Cir. 2002). "Cybersquatting" involves "the registration as domain names of well-known trademarks by non-trademark holders" who then typically "try to sell the names back to the trademark owners," who may be "willing to pay 'ransom' in order to get 'their names' back." *Id.*

"The ACPA, which was adopted in 1999, provides two different methods for the owner of a trademark or service mark to seek the transfer of an Internet domain name that is identical or confusingly similar to the owner's mark." *Hi-Rise Tech., Inc. v. Amatuerindex.com*, 2007 WL 1847249, *1 (W.D. Wash. 2007). "Under 15 U.S.C. § 1125(d)(1)—which is sometimes referred to as 'paragraph 1' of the ACPA—the owner of a mark may bring an in personam action against a person who registers, traffics in, or

---

[2] The private investigator further stated that an "IP address lookup" demonstrated that a certain IP address (78.61.78.163) is located in Vilnius, Lithuania and that this address "may very well be a criminal cyber-theft facility." (Doc. 13-7 ¶¶ 19, 21.) It is unclear from Plaintiff's motion and the exhibits thereto how this IP address relates to the www.christiescabarettucson.com domain name. Exhibit B to the motion is a subpoena response from NameSilo, the domain registrar and web hosting company that registered the www.christiescabarettucson.com domain name, and this response includes a "Login Log" from a user with the username "simplecom" whose Login IP was usually 78.61.78.163 from September 9, 2014 until May 18, 2017. (Doc. 13-2.) From June 2, 2017 to the final login in the Login Log on August 6, 2021, simplecom's Login IP was various other addresses. (*Id.*) The simplecom username appears to belong to a person named Justinas Bartusis, email address jbartusis@gmail.com, postal address Birutes g 17, Zemaiciu Naumiestis Silutes r 99207 LT (*id.*), but this person is never discussed in Plaintiff's motion or mentioned in the private investigator's declaration. The NameSilo subpoena response includes three transactions for Tadeusz Baldinsky—the registration of the www.christiescabarettucson.com domain name and two renewals—and these include IP addresses, each of which begins "188.69." (*Id.*) If Baldinsky and/or the domain name are somehow linked to Bartusis (or his online activities between 2014 and 2017), the connection is not self-evident nor is it explained in Plaintiff's filings.

uses the domain name." *Id.* "In the alternative, 15 U.S.C. § 1125(d)(2)—also known as 'paragraph 2' of the statute—authorizes the owner of the mark to bring an in rem action against the domain name itself, provided that the in rem action is brought in the judicial district in which the domain name registrar or registry is located[3] and that other conditions required by the statute are satisfied." *Id.* "Paragraph 2" provides in relevant part as follows:

> (A) The owner of a mark may file an in rem civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located if—
>
> (i) the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) or (c); and
>
> (ii) the court finds that the owner—
>
> (I) is not able to obtain in personam jurisdiction over a person who would have been a defendant in a civil action under paragraph (1); or
>
> (II) through due diligence was not able to find a person who would have been a defendant in a civil action under paragraph (1) by—
>
> (aa) sending a notice of the alleged violation and intent to proceed under this paragraph to the registrar of the domain name at the postal and e-mail address provided by the registrant to the registrar; and
>
> (bb) publishing notice of the action as the court may direct promptly after filing the action.
>
> (B) The actions under subparagraph (A)(ii) shall constitute service of process.

---

[3] Plaintiff alleges that the District of Arizona "is the situs of the domain name that is the subject of this action because NameSilo is the domain name registrar of www.christiescabarettucson.com and is located in this judicial district." (Doc. 13-1 ¶ 16.)

15 U.S.C. § 1125(d)(2)(A)-(B).

The proposed complaint alleges that the www.christiescabarettucson.com domain name violates Plaintiff's right to its registered service mark, so the first condition for Plaintiff to file an *in rem* action against the domain name is met.

The second condition requires more discussion. Because Plaintiff relies on § 1125(d)(2)(A)(ii)(II), the Court must find that Plaintiff "through due diligence was not able to find a person who would have been [an *in personam*] defendant." To make the required showing, Plaintiff must complete two tasks. First, Plaintiff must have sent a notice of the violation and intent to sue to the registrant's postal and email address. Second, Plaintiff must have published notice "of the action" "as the court may direct promptly after filing the action."

Plaintiff has already sent the required notice to the domain name registrant's postal and email address, so what remains to be determined is what notice, if any, must be published. Plaintiff notes in its motion its intention to comply with any publication requirement if its motion is granted. (Doc. 13 at 5.) Plaintiff does not, however, propose a method of publication.

It appears likely that the registrant of the www.christiescabarettucson.com domain name has deliberately and successfully concealed his or her identity and whereabouts. Under the circumstances of this case, where there is no way of knowing anything about the registrant, including the registrant's location, it does not appear to the Court that any form of publication, in any location, would be helpful in attempting to provide notice to the registrant. As such, the Court considers whether it has discretion under the statute to order no publication at all. Courts are divided on this question. *See, e.g.*, *Yahoo!, Inc. v. Yahooahtos.com*, 2006 WL 2303166, *2 (E.D. Va. 2006) ("There is some disagreement as to whether subpart (bb) makes publication mandatory or whether the inclusion of the language 'may direct' confers on courts the discretion to excuse the publication requirement entirely."); *Hi-Rise Tech., Inc.*, 2007 WL 1847249 at *5 ("There is a split in

authority as to whether a court is required to order some form of publication or whether the publication requirement may be waived.").

The "starting point" for construing a statute is "the language of the statute itself." *Comm'r v. Engle*, 464 U.S. 206, 214 (1984). "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (citations and internal quotation marks omitted). "Whether a statutory term is unambiguous, however, does not turn solely on dictionary definitions of its component words." *Yates v. United States*, 574 U.S. 528, 537 (2015). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, (1997). "[T]he susceptibility of [a] word to alternative meanings does not render the word[,] whenever it is used, ambiguous, particularly where all but one of the meanings is ordinarily eliminated by context." *Carcieri v. Salazar*, 555 U.S. 379, 391 (2009) (cleaned up).

Courts disagree as to whether the statutory language at issue here is ambiguous. In *Banco Inverlat, S.A. v. www.inverlat.com*, 112 F. Supp. 2d 521 (E.D. Va. 2000), the court determined that "[t]he statute's plain language is dispositive of this issue; it makes plain that courts have discretion to excuse the requirement for publication in appropriate circumstances." *Id.* at 523. The court reasoned that "[t]he presence of the word 'may' in § (bb) is properly read to mean that the publication requirement is within a court's discretion, meaning that a court may or may not direct notice by publication, depending on the circumstances." *Id.* Alternatively, the court concluded that "even assuming an ambiguity in this regard, statutory purpose compels the same result" because "[a] contrary result would have Congress mandating a useless act in certain circumstances." *Id.*

Meanwhile, in *Shri Ram Mission v. Sahajmarg.org*, 139 F. Supp. 2d 721 (E.D. Va.

2001), the court likewise determined that "the statute is unambiguous and clear," but contrary to *Banco*, it determined that the "the statute requires publication." *Id.* at 723-24. The court reasoned that "[t]he use of the word 'and' between paragraphs (aa) and (bb) makes paragraph (bb) mandatory." *Id.* at 724. The court construed the phrase "as the court may direct" to be synonymous with "in the manner directed by the Court" and concluded that the court "has no discretion with regard to whether or not to order publication." *Id.*

Finally, in *Yahoo!, Inc.*, the court concluded that "the ACPA's notice provisions are ambiguous." 2006 WL 2303166 at *2. The court reasoned as follows:

> On one hand, as noted in *Shri Ram Mission,* subparts (aa) and (bb) are conjoined by the word "and," suggesting that both the actual notice provision and the publication provision must be satisfied. On the other hand, subpart (bb) is worded in a manner that imposes no limitations whatsoever on the Court's discretion over the method of the publication. In light of such broad discretion, it makes little sense to read the statute in a manner that would preclude the Court from waiving publication altogether.

*Id.* (citation omitted). The court added in a footnote that the fact that the two judges in *Banco* and *Shri Ram Mission* "reached opposite conclusions regarding the import of the ACPA's notice provisions" bolstered its conclusion "that these provisions are ambiguous." *Id.* at *2 n.5. The court then construed the language "in a manner consistent with the [notice provisions'] purpose," concluding that the "[c]lear[]" purpose is "to ensure that an *in rem* action is proper and to provide notice to the registrant of the disputed domain names that his or her property is at issue in the litigation." *Id.* at *3. The court concluded that subpart (aa) provides "actual notice"—even in the absence of "proof of receipt of these communications by the registrants"—such that "any further notice by publication pursuant to subpart (bb)" is "superfluous," "excessive[,] and wasteful." *Id.*[4]

Despite the existence of diverging court opinions on this issue, this Court concludes

---

[4] Other courts have held that courts should "waive" the publication requirement "only after finding that the defendants had actual knowledge of the action against them" and have not concluded that compliance with subpart (aa) necessarily constitutes actual knowledge. *Guo v. 8bo.com*, 2014 WL 2581315, *3 (N.D. Cal. 2014); *see also Hi-Rise Tech., Inc.*, 2007 WL 1847249 at *5 ("While it appears to the Court that notice by publication is discretionary, the Court finds that publication of notice should be made in this case in order to provide an additional means of ensuring that the registrant of the domain name has fair notice of this action.").

- 7 -

that the statutory text is not ambiguous and that it grants the Court discretion to waive publication. The textual phrase "as the court may direct" is unambiguously permissive. "'May' is a permissive word, and [the Court] will construe it to vest discretionary power absent a clear indication from the context that Congress used the word in a mandatory sense." *Fernandez v. Brock*, 840 F.2d 622, 632 (9th Cir. 1988). Although the presence of the word "may" in a statute "is not necessarily conclusive of congressional intent to provide for a permissive or discretionary authority," *Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.*, 529 U.S. 193, 198 (2000), contextual clues suggest that "may" as used in § 1125(d)(2)(A)(ii)(II)(bb) means broad discretion as to whether to direct publication. The word "as" in the phrase "as the court may direct" can mean "in the manner in which" or "to the extent that." Thus, "publishing notice of the action as the court may direct" means that the court may or may not direct publication, and if it does, the publication must be done in the manner directed.

The word "and" between subparts (aa) and (bb) does nothing to undermine this interpretation of the plain language of subpart (bb). By including the word "and" between subparts (aa) and (bb), Congress established that filing an *in rem* action is impermissible unless the owner of the mark sends notice of the action to the registrant's postal and email addresses *and* completes whatever publication requirement the Court may direct—if any. In other words, the statutory language is permissive as to the Court and mandatory as to the owner of the mark.[5] The use of "and" instead of "or" simply means that the owner of the mark does not have the option to disregard whatever publication requirement the Court may direct.

Having concluded that the statute does not restrict the Court's discretion regarding directing (or not directing) publication, the Court will now consider what is the most reasonable course of action under the circumstances of this case.

---

[5] The statute is not unique in this regard. Other statues and court rules contain language granting the Court discretion to direct something and mandating that such a direction be followed. *See, e.g.*, 15 U.S.C. § 16 ("Copies . . . shall also be made available to the public at the district court and in such other districts as the court may subsequently direct.").

When courts determine that they should direct publication, there is "little consistency in the notices required." *OnNet USA, Inc. v. Play9D.com*, 2013 WL 120319, *3 (N.D. Cal. 2013). In some cases, the required notice seems to pose little realistic chance of providing notice to the registrant. For example, in *Facton Ltd. v. gstaronsale.com*, 2011 WL 4360113 (E.D. Va. 2011), the plaintiff was ordered to publish notice of the action in the *Washington Times*—an American newspaper distributed throughout the District of Columbia and in parts of Maryland and Virginia—even though "it appear[ed] that the registrant [was] located in China." *Id.* at *1-3. In other cases, mark owners are ordered to publish notice in various newspapers in a foreign vicinity, perhaps even in a foreign language. *See, e.g., Cable News Network L.P., L.L.L.P. v. CNNews.com*, 162 F. Supp. 2d 484, 487–88 (E.D. Va. 2001) (denying motion to waive publication and ordering the plaintiff to "print[] notice of the action for five consecutive days in Chinese, in the Hong Kong newspapers *Sing Tao* and *Apple Daily*, and in English, in the Hong Kong newspaper *South China Morning Post*"). Complying with such requirements can be a potentially expensive and time-consuming endeavor, especially when weighed against the rather remote possibility that the domain name's registrant will happen upon one of these notices through perusal of one of these newspapers.

Here, there is no indication that the registrant of www.christiescabarettucson.com has actual notice of this lawsuit. Although Plaintiff has complied with 1125(d)(2)(A)(ii)(II)(aa) by sending the required notices to the registrant's purported postal and email addresses, there is little reason to believe the registrant is actually monitoring those addresses. Nevertheless, the presence of actual notice is not the only reason why a court might exercise its discretion not to direct publication.

Where, as here, the registrant of a domain name has concealed his or her identity by registering the domain name under a fictitious name and has made himself or herself impossible to find by listing an inaccurate postal address and phone number, and possibly an inaccurate email address as well, and there is no way to know the city or even the country in which he or she might reside, there is simply no manner of publication that reasonably

could be expected to reach the registrant. Impossibility is reason enough for the Court to decline to direct publication. The Court further notes that the registrant's efforts to make himself or herself unfindable cut against imposing upon Plaintiff a burdensome publication requirement.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion to convert this action into an *in rem* action against the domain name www.christiescabarettucson.com (Doc. 13) is **granted**. Plaintiff shall its First Amended Complaint within 10 days of the date of this order.

**IT IS FURTHER ORDERED** that publication under § 1125(d)(2)(A)(ii)(II) is not required. Service of process is deemed effectuated.

Dated this 21st day of November, 2022.

Dominic W. Lanza
United States District Judge